R. W. COOK v. CITY OF WINSTON-SALEM AND SHERRILL PAVING COMPANY.

(Filed 4 February, 1955.)

**1. Municipal Corporations § 14a—**

The duty of a municipality to exercise reasonable care to keep its streets and sidewalks in a reasonably safe condition for travel extends to those who are blind or suffer from defective vision or other physical handicap, who are themselves exercising due care, under the circumstances, for their own safety.

**2. Same—**

A construction company which has not completed its work on a street under contract with the city is under substantially the same legal duty to the traveling public as is the city.

**3. Same—**

Neither a municipality nor a construction company improving a street under contract with the city is an insurer of the safety of travelers, whether blind or physically handicapped, or not.

**4. Same—**

Where, in the process of improving a street, a path along an intersecting street is left with a drop or slope of some two feet, plainly visible in the daytime, it would seem that neither the municipality, nor the construction company improving the street under contract with the city, is under duty in the exercise of reasonable diligence to place a signal or guard at the descent during the daytime to warn pedestrians, blind or otherwise, since a person with sight could see its condition, and a blind person must exercise a higher degree of care than would be required of a person in possession of all his senses.

**5. Same—**

A blind or otherwise handicapped person has as much right to use public ways open to pedestrians as those physically sound, but in doing so, must exercise for his own safety that degree of care which an ordinarily prudent person with the same disability would exercise under the same or similar circumstances, which requires of him a greater degree of effort to attain due care for his own safety than would be required of a person in possession of all his senses.

**6. Same—Plaintiff's evidence held to disclose contributory negligence as a matter of law in failing to use ordinary care for his own safety under the circumstances.**

Plaintiff's evidence tended to show that he was blind, and that, accompanied by his "seeing-eye" dog, he attempted to enter a street under improvement from a path along an intersecting street, that as his dog stopped he put his foot down, and slipped upon the top of the bank and slid down a two foot slope to the street, resulting in personal injuries. Plaintiff's evidence tended further to show that he assumed the construction work was finished along the street because vehicles were again using the street, but further testified that he knew the gutters along the intersecting street had not been put in, and that he had remained away from that section until he assumed the work was finished. *Held:* The fact that vehicles were traveling along the improved street was no assurance that the place where the curbing was to be put was in a reasonably safe condition for pedestrian use, and plaintiff with knowledge that the gutters had not been put in, voluntarily went to the place of danger, and therefore, plaintiff's evidence discloses contributory negligence in failing to exercise due care for his own safety, constituting a proximate cause of his injuries, and defendant's motion to nonsuit should have been allowed.

**7. Negligence § 11—**

Where a person *sui juris* knows of a dangerous condition and voluntarily goes into the place of danger, he is guilty of contributory negligence, which will bar his recovery.

JOHNSON, J., concurring.

WINBORNE, J., joins in the concurring opinion of JOHNSON, J.

BOBBITT, J., concurring in result.

APPEAL by plaintiff from *Phillips, J.,* September Term 1954 of FORSYTH.

Action to recover damages for personal injuries.

In 1951 the City of Winston-Salem entered into a contract with the Sherrill Paving Company to pave, among other streets, Peachtree Street, which included the paving of Peachtree Street at its intersection with East Marne Street. At the time plaintiff fell the paving of Peachtree Street had not been completed: the stone base had been laid, but the curb and the gutter and the top surfacing had not been put on it. Marne Street was not under repair, and is a dirt street.

In preparation for paving Peachtree Street, the grade of the street where it intersects with Marne Street was lowered or cut down about two feet. On the South side of Marne Street there was just a little gravelled path used by school children and others, until the bank got so rough. The City of Winston-Salem put the gravel down there about the time school started in 1951. J. H. Blakely, Jr., a witness for plaintiff who saw him fall, described the end of this path at Peachtree Street as follows: "There was a drop there. It appeared to me like when a bunch of us kids used to get on a bank, long ago, and just have a slide-board down it. It was approximately a good 2½ feet from the top to the bottom, and it was more than a slant taper. From the crest of the slant to the bottom, where it leveled off at, I would say it was between 2½ to 3 feet, that is, the whole slant. The perpendicular depth wouldn't be more than 24 inches. They are estimates I have got; I didn't measure it at all." This is plaintiff's description: "I know they were working on Peachtree St.; but before they did work on it that was nearly a gradual walk right across Marne on out into Peachtree, with the exception of a little water ditch down the side of the street. When they laid the stone base there to pave Peachtree Street, they cut it lower right there at the intersection of Marne Street; it evidently must have been at least 2½ feet lower than the old sidewalk was, the way it appeared to me when I went down; I imagine it was something like a 45-degree from the top down, I'd guess that." This is the description of H. J. Arnold, a witness for the plaintiff: "I would say the grade of that offset was from 2 to 3 feet, and she went off to about 4 or 5 feet, something on the order of a 45, and it was a little rough where the grading machine had knocked it off there; it didn't make as smooth a job as if it had been done with a pick and shovel and smoothed down; it was unlevel and irregular—I am talking about the edge of the top, where it looped—it was unlevel and irregular. The top edge of the stepoff was irregular; it looped back in some at places; the sidewalk would extend out a little farther at some places than it would at others; it zigzagged." J. H. Blakely, Jr., testified the slope "was obvious; you could see it all right."

At the time of plaintiff's fall there were no barricades, or warning signs of any sort at or near the end of this path on Peachtree Street. This condition had existed for several months prior to plaintiff's fall. The Sherrill Paving Company had not done any work on Peachtree Street from October or November 1951, until after plaintiff fell on 25 May 1952. The Atlantic Bitulithic Company did not commence work on the curb and gutters on Peachtree Street until after plaintiff's injury.

Plaintiff, a 76 year old blind man, who walked with the aid of a "seeing-eye" dog, lived on Forest Avenue about five blocks from the intersection of Marne and Peachtree Streets. He owned a lot on Peachtree Street. On Sunday morning, the 25th of May 1952, about 10:00 a.m. with the sun shining, he decided to walk to Peachtree Street to see a friend. He had been over this same intersection about 25 times before they started the work on Peachtree Street, but when they were working on the street, he wouldn't go down in that section until he thought it was finished, or heard it was finished. He knew Peachtree Street was being improved because he owned a lot on it. On cross-examination by the Paving Company plaintiff said: "After I knew that the improvements were being made to Peachtree Street and the other streets, I stayed off of those streets. I had passed along Peachtree Street several times in a car, and then when they turned traffic on a street, I presumed that the street was finished; so that the first time after that that I went down there walking." On this same cross-examination he further said: "I did not know that work was in progress on Peachtree Street on that day when I was taking my walk, for the curbing wasn't started for quite a little bit after I fell. I knew there was some talk about curbing, for they had got up a petition for the curbing, I knew that the curbing was to be put in. Automobiles were traveling up and down Peachtree Street when I went over there. I don't know as I asked anybody anything about the street. I didn't make any inquiry to find out what the condition of Peachtree Street was. When I travel over a street in an automobile back and forth a dozen times, I assume that the street is finished."

This is plaintiff's description of his dog on direct examination: "But my dog will always go where there is a path. If I start that way, he will take me in the path, let me walk along in the path. The idea of the dog and the way they are trained is that when you are going along, if there is any obstruction, a curb or anything in front of you, the dog is supposed to walk up to it and stop. Well, when he stops, you are supposed to stop, and if he won't go on, you urge him to go, and if he won't go, you are supposed to take your foot and feel out, to see what the obstruction is, and then figure out a way to get around it." This is his description when examined by the Court: "When my dog is with me, I don't use a stick or anything in addition to my dog; I just depend on him entirely . . . I

just know what he is going to do, and I can tell every step he makes, right and left, up or down. I can tell it by that (indicating harness). I get it through my left hand. And when you are depending on a dog, your mind is right on him all the time. If you don't, you'll get lost. You have just got to keep your mind on your dog and where you are going, and all like that, all the time."

It had rained the night before and it was muddy.

Plaintiff walked down this path on the South side of Marne Street to where it ended on Peachtree Street. His account, on direct examination, of his fall follows: "I had crossed the last driveway going in, probably 75 to 100 feet from Peachtree, and we were walking along up there, and I was expecting to come to the street any time, and the dog stopped, but evidently I was making a step with my right foot when the dog stopped. When I put it down, that is the last thing I remember. It just felt like something give 'way under my right foot, and the next thing I knew I was down in the ditch; and I heard a car coming, and someone drove up, and I hollered, and Mr. Blakely came up and talked a little and said he'd run and call the ambulance. So that is just practically all I know about it." On cross-examination by the Paving Company this is plaintiff's description of his fall: "As I came up to the intersection, my dog came to a complete stop. He always stops at any obstruction, of course, or anything like that. I don't know how long my dog remained stopped. He stopped there and, like I said before, my right foot was in the air. Just as I went to make the step, he stopped, and when I set my foot down, the dog had stopped, and when I set my foot down, that throwed my foot about probably even with his head or neck, and it hit, struck the edge of the bank; I felt something give away, and I went down the bank, and after that I don't know anything until they took me to the hospital; and the last thing I recollect is stepping on something soft, and then going down the bank."

J. H. Blakely, Jr., testifying for the plaintiff, said on direct examination: "When I was approximately 300 feet from the corner, I glanced up, and I got the appearance of a man falling; he was in the fall when my eye caught him. I went on up there and found that it was Mr. R. W. Cook, the plaintiff in this action. When I got there, Mr. Cook appeared to have just slipped down the bank, straight as a child would get on a bank, and just slide down, and he had been scrambling."

Plaintiff in his fall received injuries to his foot and ankle.

Plaintiff offered in evidence the following portion of Paragraph VI of the Further Answer of Sherrill Paving Company to the Amended Complaint: "That while this defendant was actually performing the work provided for in its contract with the City of Winston-Salem, it kept and maintained at all times barricades and lights wherever they were needed,

which was well known to the City of Winston-Salem; that when the dispute arose over the curbs and gutters and this defendant had performed all the work that it could on Peachtree Street, it took up the barricades on Peachtree Street, . . ."

Plaintiff first sued the City of Winston-Salem. The city made the Sherrill Paving Company a party defendant, whereupon the plaintiff filed an amended complaint against the Paving Company.

At the close of plaintiff's evidence, each defendant moved for judgment of nonsuit, which the court allowed.

Judgment of involuntary nonsuit was entered, and plaintiff appeals.

*Deal, Hutchins & Minor for Plaintiff, Appellant.*

*Womble, Carlyle, Martin & Sandridge for Defendant, Appellee City of Winston-Salem.*

*Jordan & Wright and Perry C. Henson for Defendant, Appellee Sherrill Paving Company.*

PARKER, J. The law in respect to liability for injury to a pedestrian due to condition of street as affected by his blindness or other physical disability is clearly stated in 141 A.L.R. Annotation II, pp. 721-2: "It is the general rule that those charged with duties respecting the condition of public ways open to pedestrians must exercise due and reasonable care to keep them reasonably safe for travel by the public, including those who are blind or suffer from defective vision or other physical infirmity, disability, or handicap, and are themselves exercising due care, under the circumstances, for their own safety. While a city or other authority or person owes no more than due, ordinary, or reasonable care toward a blind or other physically afflicted or handicapped pedestrian, in respect of the condition of walkways, the effect of the affliction or handicap may be considered in determining whether the required degree of care has been exercised, which seems a natural conclusion from the premise that such persons have as much right to use such ways as those physically sound, and in harmony with the proposition that the physical condition of the person injured is a proper matter for consideration' in determining whether or not he has exercised the degree of care imposed upon him by law, as regards freedom from contributory negligence." Cases from many jurisdictions are cited in support.

The Sherrill Paving Company had not completed its work on Peachtree Street, because the top surfacing had not been put on. The Sherrill Paving Company, having entered into a contract with the City of Winston-Salem to pave Peachtree Street, "was under substantially the same legal duty to the travelling public" as the City of Winston-Salem.

*Presley v. Allen & Co.,* 234 N.C. 181, 66 S.E. 2d 789; *Broadaway v. King-Hunter, Inc.,* 236 N.C. 673, 73 S.E. 2d 861.

Neither the City of Winston-Salem, nor the Sherrill Paving Company, was an insurer of the safety of travellers, whether blind, or physically handicapped, or not, using the path on the South side of Marne Street. *Welling v. Charlotte, ante,* 312, 85 S.E. 2d 379; *Broadaway v. King-Hunter, Inc., supra;* Anno. 141 A.L.R. pp. 721-2.

The descent or drop or slope of the patch on the South side of Marne Street, where it intersected Peachtree Street, was plainly visible in the daytime. The paving on Peachtree Street was not completed, though it had been stopped for a number of months because of a dispute over curbing. It would seem that it was not the duty of the defendants, in the exercise of reasonable diligence, and in order to keep the street in a reasonably safe condition, to place a signal or guard at the descent or drop or slope *during the daytime, when it was plainly visible. Rock Island v. Gingles,* 217 Ill. 185, 75 N.E. 468; *Presley v. Allen & Co., supra;* 63 C.J.S., Mun. Corp., p. 158.

Plaintiff's allegations of negligence are: the top of the bank had crumbled, leaving loose dirt thereon, which had become pulverized and slick; that no warning signals or barricades were there to give notice of danger; and that the bank had been cut down almost straight instead of cutting it with a gradual slope. The entire condition of the top of this bank and the way it had been cut down, as alleged by plaintiff, was clearly obvious and visible in the daytime. It would appear that plaintiff's evidence fails to show any failure on the part of the defendants to exercise reasonable diligence to keep the end of this path at Peachtree Street in a reasonably safe condition for pedestrians, blind or otherwise, *using this path in the daytime,* because a person with sight could see its condition, and because as to a blind person "ordinary care on his part meant a higher degree of care than would be required of a person in the possession of all his senses," (*Foy v. Winston,* 126 N.C. 381, 35 S.E. 609).

But if we concede, which we do not, that the evidence made out a case of negligence against the defendants, nevertheless, it is manifest from plaintiff's evidence that he, although blind and using a "seeing-eye" dog, failed to exercise due care for his own safety, which was a proximate contributing cause of his injuries.

It is undoubted law that the blind, the halt, and the lame have as much right to use public ways open to pedestrians as those physically sound. *Weinstein v. Wheeler,* 127 Or. 411, 271 Pac. 733, 62 A.L.R. 574; Anno. 141 A.L.R., p. 721. See also *Foy v. Winston, supra.*

It seems to be the general rule that a blind, or otherwise handicapped person, in using the public ways, must exercise for his own safety due care, or care commensurate with the known or reasonably foreseeable

dangers. Due care is such care as an ordinarily prudent person with the same disability would exercise under the same or similar circumstances. *Keith v. Worcester & B. V. Street R. Co.*, 196 Mass. 478, 82 N.E. 680, 14 L.R.A., N.S. 648; *Jones v. Bayley*, (Cal.), 122 P. 2d 293; Anno. 21 L.R.A., N.S., p. 627 *et seq.*; *Muse v. Page*, 125 Conn. 219, 4 A. 2d 329; *Gill v. Sable Hide & Fur Co.*, (Ky.) 4 S.W. 2d 676; 65 C.J.S., Negligence, Sec. 142; Anno. 62 A.L.R., p. 580 *et seq.*; Anno. 147 A.L.R., p. 724 *et seq.*

In respect to the care required of a blind person for his own safety we approved this instruction to the jury by the trial judge in *Foy v. Winston, supra*: "That being blind did not relieve him from exercising ordinary care in passing along the sidewalk, and that ordinary care on his part meant a higher degree of care than would be required of a person in the possession of all his senses."

In *Fann v. R. R.*, 155 N.C. 136, 71 S.E. 81, the jury found the plaintiff guilty of contributory negligence. The plaintiff was deaf. This Court said: "The fact that he was deaf should have quickened his obligation to look more carefully, as held in *Foy v. Winston*, 126 N.C. 381."

In *Keith v. Worcester & B. V. Street R. Co., supra*, it is said: "But it is also correct to say that, in the exercise of common prudence, one of defective eyesight must usually, as matter of general knowledge, take more care and employ keener watchfulness in walking upon the streets and avoiding obstructions than the same person with good eyesight, in order to reach the standard of excellence established by the law for all persons alike, whether they be weak or strong, sound or deficient."

In *Smith v. Sneller*, 345 Pa. 68, 26 A. (2d) 452, 141 A.L.R. 718, the Court quoted with approval from *Fraser, Appellant, v. Freedman*, 87 Pa. Super 454 (a case in which recovery was denied a blind man who fell into an open cellarway extending into the sidewalk) as follows: " 'The law requires a degree of care upon the part of one whose eyesight is impaired proportioned to the degree of his impairment of vision. He is bound to use the care which would be exercised by an ordinary prudent person, and in passing upon the question of his negligence due consideration should be given to blindness or other infirmities. In the exercise of common prudence one of defective eyesight must usually, as a matter of general knowledge, take more care and employ keener watchfulness in walking upon the streets and avoiding obstructions; in order to reach the standard established by law for all persons alike, whether they be sound or deficient. The statement that a blind or deaf man is bound to a higher degree of caution than a normal person does not mean that there is imposed upon him a higher standard of duty, but rather that in order to measure up to the ordinary standard he must the more vigilantly exercise caution through other senses and other means, in order to compensate for

the loss or impairment of those senses in which he is defective;'" citing many authorities. The Court then says: "We cannot escape the conclusion of the Superior Court that the instant case is ruled by the *Fraser case.* While it is not negligence *per se* for a blind person to go unattended upon the sidewalk of a city, he does so at great risk and must always have in mind his own unfortunate disadvantage and do what a reasonably prudent person in his situation would do to ward off danger and prevent an accident."

The plaintiff knew that construction work was being done on Peachtree Street. He knew on the day he fell that the curbing had not been put in. The principle "that ordinarily one may assume the public streets to be in a reasonably safe condition" has no application here. *Beaver v. China Grove,* 222 N.C. 234, 22 S.E. 2d 434. "No one needs notice of what he already knows." *Lane v. Lewiston,* 91 Me. 292.

In *Dunnevant v. R. R.,* 167 N.C. 232, 83 S.E. 347, the Court said: "And where a person *sui juris* knows of a dangerous condition and voluntarily goes into the place of danger, he is guilty of contributory negligence, which will bar his recovery." This statement has been quoted with approval in the recent case of *Gordon v. Sprott,* 231 N.C. 472, 57 S.E. 2d 785.

It is our duty now to apply the law to the facts here. The plaintiff knew that construction work had been in progress on Peachtree Street, and knew that it was not finished, because he testified, "I knew that the curbing was to be put in." On direct examination plaintiff said: ". . . when they were working on the street, I wouldn't go down in that section until I thought it was finished, or heard it was finished." On cross-examination he said: "I had passed along Peachtree Street several times in a car, and then when they turned traffic on a street, I presumed that the street was finished; so that the first time after that that I went down there walking." He said further on cross-examination: "Automobiles were traveling up and down Peachtree Street when I went over there. I don't know as I asked anybody anything about the street. I didn't make any inquiry to find out what the condition of Peachtree Street was. When I travel over a street in an automobile back and forth a dozen times, I *assume* that the street is finished." The plaintiff had no right to presume or assume the path was in a reasonably safe condition as it entered Peachtree Street, for he knew the curbing was still to be put in, and he knew that in entering Peachtree Street he would have to cross where the curbing would be. The fact that automobiles were travelling on Peachtree Street was no assurance that the place where the curbing was to be put was in a reasonably safe condition for use of pedestrians. And yet, plaintiff knowing that the construction work as to curbing on Peachtree Street was not finished, and knowing that it was dangerous to him in his

condition to go there, for he remained away from that section until, as he testified, he *assumed* the work was finished because of automobile traffic, voluntarily went there into a place of danger, and on a Sunday morning about 10:00 a.m., with the sun shining, at the place where the path on the South side of Marne Street entered Peachtree Street fell down a descent or drop or slope of about 2 feet, which was plainly and clearly obvious.

If plaintiff had had normal sight, he would undoubtedly be barred of recovery by reason of contributory negligence. *Burns v. Charlotte,* 210 N.C. 48, 185 S.E. 443; *Houston v. Monroe,* 213 N.C. 788, 197 S.E. 571; *Watkins v. Raleigh,* 214 N.C. 644, 200 S.E. 424; *Walker v. Wilson,* 222 N.C. 66, 21 S.E. 2d 817; *Welling v. Charlotte, supra.*

Plaintiff's evidence compels the conclusion that he, a blind man, failed to put forth a greater degree of effort than one not acting under any disabilities to attain due care for his own safety: that standard of care which the law has established for everybody. *Foy v. Winston, supra.* Such a failure to exercise due care for his own safety was a proximate contributing cause of his injuries.

We have examined the cases relied upon by plaintiff, and they are distinguishable.

What *Stacy, C. J.,* said in *Houston v. Monroe, supra,* is applicable here: "In the circumstances thus disclosed by the record, we are constrained to hold that the demurrer to the evidence should have been sustained, if not upon the principal question of liability, then upon the ground of contributory negligence."

The judgment of nonsuit below is
Affirmed.

JOHNSON, J., concurring: I concur in the result reached in the majority opinion on the single ground that the plaintiff's evidence is insufficient to make out a case of actionable negligence against the defendants, and this being so, I see no reason for a discussion of the question of contributory negligence.

WINBORNE, J., joins in this concurring opinion.

BOBBITT, J., concurring in result: I agree that the facts shown are insufficient to constitute actionable negligence. For this reason, I concur in the result.

Decision does not require that we determine whether the plaintiff was contributorily negligent as a matter of law. If such determination were required, the issue of contributory negligence, in my opinion, would be for the jury under instructions embodying the principles set forth in the Court's opinion. The contributory negligence issue was submitted to the

jury in *Foy v. Winston,* 126 N.C. 381, 35 S.E. 609, and in *Fann v. R. R.,* 155 N.C. 136, 71 S.E. 81.